IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 14-cv-00227-RBJ

LYLE BYRUM, BYRUM FAMILY TRUST,
ROBERTO TOHME, and ATI JET, INC.,

      Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

      Defendant.

---

# ORDER

---

Before the Court are Defendant's Motion for Summary Judgment [ECF No. 59] and

Plaintiff Lyle Byrum's Partial Motion for Summary Judgment [ECF No. 60].  For the reasons set

forth below, the defendant's motion is granted in part and denied in part, and the plaintiff's

motion is denied.

    **I.  <u>Facts</u>.**

    **A.  <u>General Background</u>.**

The present case centers on two loans that defendant Wells Fargo Bank, N.A. ("the

Bank") made to plaintiff Lyle Byrum and his business partner Dr. Robert Phelan.  In February of

2008, Mr. Byrum, through his family trust, along with ATI Jet, Inc. (a private jet charter business

of which Mr. Byrum is president), Dr. Phelan, and plaintiff Roberto Tohme (Mr. Byrum's

partner in ATI Jet, Inc.) purchased a home at the Cordillera resort community, located at 5

Fairway Lane in Edwards, Colorado ("the Cordillera Property").  ECF No. 59-1, Ex. 1,

Deposition of Lyle Byrum, at 30: 8–21.  Mr. Byrum and DeAnna Underhill, the vice president of

sales and marketing of ATI Jet, Inc., had first become interested in the Cordillera Property after

seeing it in a magazine; they later contacted a real estate agent and visited the property.  ECF No.

59-2, Ex. 2, Deposition of DeAnna Underhill, at 19:3–20:24.  According to Ms. Underhill, they

decided to purchase that particular property because it was "in a great location," had the type of

amenities they wanted, and overall was the right fit for their purposes.  *Id.* at 22:12–21.  Once

Mr. Byrum and Ms. Underhill had decided that they liked the property, they sought out

financing.  *Id.* at 23:10–12.

Upon the recommendation of the seller's real estate agent, Mr. Byrum and Ms. Underhill

reached out to Patricia Moralez-Buxman ("Ms. Moralez") at Wells Fargo, who worked with

them throughout the loan application process.  ECF No. 59-2, Ex. 2, Deposition of DeAnna

Underhill, at 12:9–16, 23:10–24:5.  After exploring different financing options with Ms.

Moralez, the four owners of the Property—the Byrum Family Trust, ATI Jet, Inc., Dr. Phelan,

and Mr. Tohme—financed the purchase with two loans from Wells Fargo taken out by Mr.

Byrum and Dr. Phelan: (1) a conventional loan for $926,250 with an interest rate of 6.375% and

(2) a home equity line of credit for $123,000 (collectively, "the Loans").[1]  ECF No. 59 at 2; ECF

No. 63 at 4; ECF No. 63-3, Ex. 3, Note; ECF No. 63-4, Ex. 4, HELOC Note.  Mr. Byrum, Dr.

Phelan, ATI Jet, Inc., and Mr. Tohme all contributed to the down payment on the property.  ECF

No. 59-1, Ex. 1, Deposition of Lyle Byrum, at 108:1–19.

Mr. Byrum and Dr. Phelan did not directly make payments on the Loans; rather, they

---

[1] The deed itself lists Ms. Underhill, who is Mr. Byrum's stepdaughter, as an owner, although the other
parties did not consider her to be an owner.  *See* ECF No. 59-1, Ex. 1, Deposition of Lyle Byrum, at 176:
4–15.  Ms. Underhill, however, did not make any down payment or any payments on any of the loans; she
was apparently included on the deed under the assumption that it if the property increased in value, it
would be a bonus for her employment.  ECF No. 59-2, Ex. 2, Deposition of DeAnna Underhill, at 32:24–
34:8.

were made at different times by ATI Jet, Inc. and by a company called ATI Resort Sales, LLC. ECF No. 59-1, Ex. 1, Deposition of Lyle Byrum, at 118:2–120:6; ECF No. 63-5, Ex. 5, Deposition of Connie Parsons, at 87:22–88:1. According to Connie Parsons, Mr. Byrum's secretary, ATI Resort Sales, LLC was an LLC set up to manage the business of renting out the Cordillera Property. ECF No. 59-6, Ex. 6, Deposition of Connie Parsons, at 19:20–20:11. The LLC had a bank account set up to make payments on the Loans, and every month each of the four owners—the Byrum Family Trust, ATI Jet, Inc., Mr. Tohme, and Dr. Phelan—would write a check to the LLC for his or its portion of the payment. *Id.* at 20:21–21:1, 25:3–18. According to Mr. Byrum, the four owners split the payments equally. ECF No. 59-1, Ex. 1, Deposition of Lyle Byrum, at 95:10–13.

The only Wells Fargo agent that Mr. Byrum and Ms. Underhill interacted with during the process of obtaining financing was Ms. Moralez. ECF No. 60 at 2; ECF No. 64 at 2; ECF No. 59-2, Ex. 2, Deposition of DeAnna Underhill, at 12:9–16, 23:10–24:5. The parties disagree about the precise nature of Mr. Byrum and Ms. Underhill's relationship with Ms. Moralez and the Bank. Mr. Byrum believes that he, along with Ms. Underhill, met with Ms. Moralez twice in person, and he may have spoken with her on the phone as well. ECF No. 63-1, Ex. 1, Deposition of Lyle Byrum, at 48:1–8. All of these interactions involved the application process for the Loans; he had no other dealings with Ms. Moralez. *Id.* at 70:10–13. According to Mr. Byrum, he considered her to be his "financial advisor," given that he had banked with Wells Fargo "for years." *Id.* at 69:24–70:2. However, he had not previously interacted with Ms. Moralez, and he did not consider her to be his real estate agent, real estate advisor, or investment advisor. *Id.* at 69:21–70:23. He also understood, of course, that he had the option to apply for financing with a different lender. *Id.* at 50:9–15.

B. **Financial Troubles at Cordillera.**

The dispute between the parties centers, in part, on information that Ms. Moralez communicated or failed to communicate to Mr. Byrum about the Cordillera property.  According to Mr. Byrum, Ms. Moralez's opinion about the Property was that it was "the top-of-the-line property in the Vail area.  It was one of the top properties."  *Id.* at 70:25–71:2.  However, on Mr. Byrum's account, these statements turned out to be false because of "massive problems" in the Cordillera community, namely financial mismanagement issues that resulted in a bankruptcy filing and litigation against the resort.  *Id.* at 53:11–15; 63:23–64:4.  It is undisputed that Ms. Moralez did not communicate any information about the bankruptcy or litigation to Mr. Byrum; in fact, there does not appear to be any evidence that Ms. Moralez knew about either.  However, Mr. Byrum believes that Wells Fargo as an institution "knew what was going on" both because it was involved in the bankruptcy and, moreover, is "in the community," so it knows "what's going on in the community."  *Id.* at 69:4–20.

In any event, Mr. Byrum was unaware of the financial problems within the community when he purchased the Property.  These troubles eventually caused the resort's club, where Mr. Byrum had purchased a membership for "somewhere around $100,000" with a loan from another lending institution (which he was directed to by Ms. Moralez, since Wells Fargo did not offer that type of financing), to close for about a year.  *Id.* at 53:11–15, 63:23–64:4, 101:24–102:15, 218:24.  In Mr. Byrum's words, the problems with the community made his membership at the Cordillera club "worthless," and they "could have" affected his interest in the property in other ways.  *Id.* at 72:12–25.  However, he was not required to purchase the membership as a condition of buying the home, and the membership is presently worth about $40,000.  *Id.* at 218:10–21; 219:13.

C. **Refinancing**.

Another point of contention between the parties concerns Mr. Byrum's ability to refinance the conventional loan.  On Mr. Byrum's account, he told Ms. Moralez that the interest rate on a loan she originally suggested was too high, and she then "[came] up with a proposal of a second mortgage that would be at a reduced rate, but the first loan would be a higher rate" and could be refinanced "as soon as the real estate rates went down." *Id.* at 48:20–49:5.  Mr. Byrum, according to his own recollection, was "adamant" about his need to refinance because "6 ½ percent is a high rate for a piece of real estate." *Id.* at 53:20–25.  Specifically, he told Ms. Moralez that "if [he] could not refinance that property at a lower rate in the near future, [he] didn't want to buy it.  If the rates came down and [he] couldn't refinance it, [he] didn't want to buy the property." *Id.* at 54:1–6.  According to Mr. Byrum, Ms. Moralez "assured [him] that [refinancing] would be possible." *Id.* at 54:8–9.  In other words, "[w]hen the rates started coming down, [they] could reapply [for a loan with a lower rate]." *Id.* at 49:13–14.  However, Mr. Byrum understood, based on his experience of refinancing loans in the past, that there were a number of reasons for which a refinance application could be denied, including that the applicant's credit score is not high enough. *Id.* at 61:1–13.

Furthermore, the parties agree that Ms. Moralez did not promise that the loan could be refinanced at any particular rate or at any particular time, nor did she promise that Wells Fargo would waive its application or underwriting requirements. *Id.* at 49:6–17; 61:23–62:9.  In fact, according to Ms. Moralez, although she does not remember her specific conversations with Mr. Byrum, she never would have promised a customer that a loan she originated could be refinanced in the future because she did not "have that authority."[2]  ECF No. 59-4, Ex. 4, Deposition of

---

[2] Defendant argues that this statement is inadmissible because evidence of the general habits of a person is not admissible for the purpose of showing her conduct upon a specific occasion.  ECF No. 65 at 5

Patricia Moralez-Buxman, at 117:18–118:1.

Mr. Byrum did eventually attempt to refinance the conventional loan by having his secretary, Ms. Parsons, contact Wells Fargo in April of 2012.  ECF No. 59-1, Ex. 1, Deposition of Lyle Byrum, at 144:9–23; ECF No. 59-5, Ex. 5, Deposition of Connie Parsons, at 29:1–10.  However, Wells Fargo denied Mr. Byrum's multiple requests for refinancing over the next several months.  ECF No. 59-1, Ex. 1, Deposition of Lyle Byrum, at 170:5–9.  In February of 2013, a Wells Fargo representative, Melanie Colvin, informed Ms. Parsons that the loan could not be refinanced because both Mr. Byrum and Dr. Phelan's credit scores were "well below" the score of 700 required under the Bank's guidelines.  ECF No. 59-7, Ex. 7, Credit Scores Email.  In her email to Ms. Parsons, Ms. Colvin wrote, "I am sorry you weren't told this information from the very beginning when you started this a year ago."  *Id.*  Ms. Colvin testified that Wells Fargo is able to check one of its customer's credit scores within a matter of minutes.  ECF No. 59-12, Ex. 12, Deposition of Melanie Colvin, at 18:5–7.

According to Mr. Byrum, his Equifax credit score at the time he applied for the Loans was 735, and the home equity line of credit reduced his credit score by about 80 points.[3]  *Id.* at 115:22–116:2, 132:1–3; 134:15–24.  Thus, he contends, by structuring the Loans to include the home equity line, Ms. Moralez made it impossible for him to refinance the conventional loan,

---

(citing *Levin v. United States*, 338 F.2d 265, 270 (D.C. Cir. 1964).  Ms. Moralez's statement, however, does not concern a regular habit, but rather addresses how she performs her job in light of the authority she has at the Bank.  Thus the Court is unpersuaded by defendant's argument.

[3] Defendant argues that Mr. Byrum's testimony about his credit scores is inadmissible, citing *Bankston v. Americredit Fin. Servs., Inc.*, No. C 09-04892 SBA, 2011 WL 89730 (N.D. Cal. Jan. 10, 2011), for the proposition that "[u]nder the best evidence rule, proof of what the credit report stated must be established by the report itself," *id.* at *7.  However, *Bankston* is not on-point here.  In that case, the plaintiff's claim concerned the contents of the report itself.  *See id.*  Here, plaintiffs' claim turns on what Mr. Byrum's credit score was; thus, while his credit reports would reflect that score, they are not themselves the subject of the claim.

despite her assurances that it could be refinanced.[4]

After failing to secure a new loan, Mr. Byrum and Dr. Phelan applied for a hardship loan modification. ECF No. 59-11, Ex. 11, Mortgage Payment Assistance Letter. According to Mr. Byrum, a Wells Fargo representative had told him to miss a payment, so that they would qualify for the modification. ECF No. 59-1, Ex. 1, Deposition of Lyle Byrum at 121:22–122:1. Despite their missing a payment, this request was ultimately denied because Mr. Byrum and Dr. Phelan failed to submit the required paperwork. ECF No. 59-11, Ex. 11, Mortgage Payment Assistance Letter. Mr. Byrum's failed attempt to modify the loan ultimately led to litigation between himself and Dr. Phelan, which was resolved by a settlement under which all of the owners of the Property transferred their interests to Dr. Phelan, and he paid off the Loans. ECF No. 59-1, Ex. 1, Deposition of Lyle Byrum at 205:3–23.

## II. Discussion.

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

---

[4] Plaintiffs also allege that the value of the Property declined such that the loan to value ratio was not within the Bank's minimum requirements in part due to the bankruptcy filing. ECF No. 58 at ¶ 38. However, their response to defendant's motion makes no mention of such a change in the loan to value ratio and does not appear to point to any evidence relevant to this allegation. *See generally* ECF No. 63.

The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

Plaintiffs' Third Amended Complaint [ECF No. 58] brings six claims for relief: (1) fraudulent inducement, (2) negligent misrepresentation, (3) negligence, (4) breach of fiduciary duty and the duty of good faith and fair dealing (addressed as separate claims below), (5) violations of the Colorado Consumer Protection Act, and (6) Prohibited Acts under C.R.S. § 38-40-105. Defendant moves for summary judgment on all claims. Plaintiff Lyle Byrum, in turn, moves for summary judgment with respect to liability on the negligent misrepresentation claim. The Court will address each claim in turn.

## 1. Fraudulent Inducement

As defendant's motion notes, plaintiffs filed the fraudulent inducement claim the day before defendant filed the present motion for summary judgment. *See* ECF Nos. 57, 58, 59. Because the Court has allowed the defendant to file a supplemental motion for summary judgment regarding this claim and defendant has indicated that it will do so, ECF No. 59 at 9, the Court declines to address this claim at this time.

## 2. Negligent Misrepresentation

Both parties seek summary judgment on plaintiffs' negligent misrepresentation claim. Under Colorado law, as adopted from Restatement (Second) of Torts § 552, a party is liable for negligent misrepresentation when

> (1) [he or she] in the course of his or her business, profession or employment; (2) makes a misrepresentation of a material fact, without reasonable care; (3) for the guidance of others in their business transactions; (4) with knowledge that his or her representations will be relied upon by the injured party; and (5) the injured party justifiably relied on the misrepresentation to his or her detriment.

*Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011).  Plaintiffs' claim in the present case is apparently grounded in Ms. Moralez's alleged promise to Mr. Byrum that he would be able to refinance the conventional loan at a future date.[5]  The parties dispute whether (1) Ms. Moralez made a misrepresentation of material fact without reasonable care, (2) whether any reliance was justified, and (3) whether any reliance was detrimental.

### a. Misrepresentation of Material Fact

Beginning with the first issue, under the Restatement, a party is liable for making a misrepresentation of material fact "if he fails to exercise reasonable care or competence in obtaining or communicating the information."  Restatement (Second) of Torts § 552.  "What is reasonable is, as in other cases of negligence, dependent upon the circumstances.  It is, in general, a matter of the care and competence that the recipient of the information is entitled to expect in the light of the circumstances."  *Id.*, comment e.  "[T]his will vary according to a good many factors. The question is one for the jury, unless the facts are so clear as to permit only one conclusion."  *Id.*  Moreover, "[w]hen the information consists of an opinion upon facts supplied by the recipient or otherwise known to him, the recipient is entitled to expect a careful

---

[5] The negligent misrepresentation claim as laid out in the Third Amended Complaint is premised on the Bank's failure to make disclosures about the Cordillera litigation and the effect the home equity line of credit would have on Mr. Byrum's credit score.  ECF No. 58 at 12.  The plaintiff's motion for summary judgment, however, asserts that Ms. Moralez "negligently misrepresented to Mr. Byrum his ability to refinance the [conventional] loan at a future date."  ECF No. 60 at 4.  Because both parties have presented arguments based exclusively on this latter theory, the Court considers only this alleged promise as the basis for the claim in the above discussion.  Furthermore, a negligent misrepresentation claim grounded in the failure to disclose particular facts cannot be maintained in the absence of a special relationship between the parties.  *See Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 295 (Colo. App. 2009), *as modified on denial of reh'g* (June 11, 2009).  Because the Court concludes below that the Bank and Mr. Byrum did not stand in a fiduciary relationship and there appears to be no other basis for finding a special relationship between the parties, the Court finds that to the extent plaintiff intends to pursue the negligent misrepresentation claim on the basis of the Bank's alleged failure to disclose particular facts, the claim is not viable.  *Cf. Colonial Imports, Inc. v. Carlton Nw., Inc.*, 853 P.2d 913, 916–17 (Wash. 1993) (discussing requirement of a special relationship under Washington law based on the same Restatement provision as Colorado law).

consideration of the facts and competence in arriving at an intelligent judgment." *Id.*

In the present case, there is sufficient factual dispute about the content of Ms. Moralez's conversations with Mr. Byrum and Ms. Underhill and about what was reasonable under the circumstances to preclude the entry of summary judgment for either party. Construing the evidence in the light most favorable to plaintiffs, the Court finds that a jury could conclude that after Mr. Byrum told Ms. Moralez that he would not take out the Loans if he could not refinance the conventional one in the near future, she assured him that he would be able to refinance it. *See* ECF No. 63-1, Ex. 1, Deposition of Lyle Byrum, at 53:20–25, 54:1–6 (Mr. Byrum was "adamant" about his need to refinance and told Ms. Moralez that "if [he] could not refinance that property at a lower rate in the near future, [he] didn't want to buy it."). Although it is undisputed that Mr. Byrum understood that he would be required to go through the standard application process to get a new loan, on plaintiffs' version of the facts, he nonetheless relied on Ms. Moralez's implicit assurances that nothing about the structure of the Loans themselves would make future refinancing impossible. *See id.* at 54:8–9 (Ms. Moralez "assured [Mr. Byrum] that [refinancing] would be possible."). A jury could further conclude that it was unreasonable for Ms. Moralez to make such assurances without first carefully considering the impact the home equity line would have on Mr. Byrum's credit score and how that would affect his ability to refinance the conventional loan. *See id.* at 132:1–3; 134:15–24 (the home equity line of credit may have lowered Mr. Byrum's credit score by about 80 points). Thus a jury could find that Ms. Moralez made a misrepresentation of material fact about Mr. Byrum's ability to refinance the conventional loan.

However, on the facts presently before the Court, a jury could also reach the opposite conclusion. Ms. Moralez testified at her deposition that, although she does not remember her

specific conversations with Mr. Byrum, she never would have promised a customer that a loan she originated could be refinanced in the future because she did not "have that authority."  ECF No. 59-4, Ex. 4, Deposition of Patricia Moralez-Buxman, at 117:18–118:1.  Thus a jury could find that she made no assurances about Mr. Byrum's ability to refinance the conventional loan in the near future.  Furthermore, a jury might conclude that, in the light of the circumstances surrounding the parties' interactions (Mr. Byrum is a sophisticated businessman and Ms. Moralez was attempting to sell him a loan), Mr. Byrum was not entitled to expect that Ms. Moralez would investigate the effect that the home equity line would have on his credit score and ability to refinance the conventional loan.  In sum, a reasonable jury could also find a lack of any misrepresentation of material fact.  For this reason, the Court denies Mr. Byrum's Motion for Partial Summary Judgment.

The defendant also makes the distinct but related argument that Ms. Moralez offered Mr. Byrum nothing more than a promise of future performance, which cannot constitute a misrepresentation of material fact.  "In a claim for negligent misrepresentation, the misrepresentation must be of a material fact that presently exists or has existed in the past.  A promise relating to future events without a present intent not to fulfill the promise is not actionable."  *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.*, 892 P.2d 230, 237 (Colo. 1995), *as modified on clarification* (Feb. 21, 1995) (internal citations omitted).  However, the Court thinks it clear that plaintiffs' contention is not that Ms. Moralez promised to refinance the conventional loan in the future, but rather that a present characteristic of the loan was that it was capable of being refinanced.  Thus, on plaintiffs' theory, Ms. Moralez's misrepresentation did not involve a promise about the future, but rather a statement of present fact.[6]  The Court

---

[6] Wells Fargo points to *McLean v. Countrywide Home Loans, Inc.*, No. 09-CV-11239, 2009 WL 5171842 (E.D. Mich. Dec. 22, 2009), in which the court held that "representations that the plaintiffs would later be

accordingly declines to enter summary judgment for defendant on this basis.

**b.  Justified Reliance**

Defendant additionally argues that plaintiffs cannot show that they justifiably relied on any misrepresentation related to Mr. Byrum's ability to refinance the conventional loan at a future date.  *See Mehaffy, Rider, Windholz & Wilson*, 892 P.2d at 238 ("Reliance is a necessary element of a claim for negligent misrepresentation.").  However, plaintiffs have pointed to sufficient evidence to allow a jury to find justifiable reliance.  Specifically, Mr. Byrum testified at his deposition that he told Ms. Moralez that he would not buy the property if the loan could not be refinanced in the near future.  ECF No. 63-1, Ex. 1, Deposition of Lyle Byrum, at 55:10–23.  Although Mr. Byrum understood, of course, that refinancing involved an application process, the jury could find that he relied on Ms. Moralez's implicit representation that nothing about the structure of the loan package made future refinancing of the conventional loan impossible.  For this reason, the Court declines to enter summary judgment for defendant on this basis.

**c.  Reliance to Plaintiffs' Detriment**

Lastly, defendant argues that plaintiffs have not suffered any recoverable damages.  "Damages recoverable for negligent misrepresentation include (1) the difference between the value of what the plaintiff received and its purchase price or other value given for it (out-of-pocket expenses); and (2) other pecuniary loss suffered as a consequence of the plaintiff's reliance upon the misrepresentation (consequential damages)."  *W. Cities Broad., Inc. v. Schueller*, 849 P.2d 44, 49 (Colo. 1993).  It does not appear plaintiffs have alleged any out-of-

---

able to . . . refinance the loan . . . are not actionable representations of past or existing facts, *id.* at *4, for the proposition that statements about whether a loan can be refinanced in the future are not actionable on a negligent misrepresentation theory."  However, unlike in the present case, nothing about the structure of the loan itself in *McLean* made it incapable of being refinanced.  Thus the Court does not find *McLean* persuasive here.

pocket expenses as damages; rather, they assert consequential damages stemming from Mr. Byrum and Dr. Phelan's inability to refinance the conventional loan in April of 2012, namely the additional amount paid in interest because their application to refinance was denied. As relevant here, defendant argues that plaintiffs cannot recover any such damages because (1) they did not make payments on the Loans and (2) they cannot present any admissible evidence of what the interest rate on a refinanced loan would have been.[7]

Beginning with the first argument, the Bank points out that Mr. Byrum did not himself make payments on the Loans; rather, they were made by a company called ATI Resort Sales, LLC (and, for a time, by ATI Jet, Inc.). ECF No. 59-1, Ex. 1, Deposition of Lyle Byrum, at 118:2–120:6; ECF No. 59-6, Ex. 6, Deposition of Connie Parsons, at 19:20–20:11, 20:21–21:1, 25:3–18. Thus, Wells Fargo contends, ATI Resort Sales, LLC and ATI Jet, Inc. are the only entities that could recover any damages for excessive interest payments. However, none of the cases defendant cites in support of this proposition are on point here. *See Nw. Dev., Inc. v. Dunn*, 29 Colo. App. 364, 369, 483 P.2d 1361, 1363 (1971) (holding only that shareholders cannot sue where corporation sustained damages, but they suffered no individually redressable injury); *Precision Fitness Equip. of Pompano Beach, Inc. v. Nautilus, Inc.*, No. 08-CV-01228-CMA-KLM, 2010 WL 5349852, at *3 (D. Colo. Dec. 20, 2010) (noting that the value of a related company was not relevant to the diminution in value of the plaintiff company); *Gentex Corp. v. United States*, 61 Fed. Cl. 49, 53–54 (2004) (finding plaintiff did not have requisite actual injury for standing purposes).

---

[7] Wells Fargo also argues that none of plaintiffs' damages were reasonably foreseeable at the time the Loans were made. However, according to Mr. Byrum's deposition testimony, he made it clear to Ms. Moralez that he would not take out the Loans if he could not refinance the conventional loan in the near future. ECF No. 63-1, Ex. 1, Deposition of Lyle Byrum, at 54:1–6. The Court thinks this statement is sufficient to find that any damages stemming from Mr. Byrum and Dr. Phelan's inability to refinance were reasonably foreseeable.

Rather, the Court thinks it clear that if Ms. Moralez's statements about Mr. Byrum's ability to refinance the conventional loan constitute a misrepresentation of material fact, a jury could find that plaintiffs suffered consequential damages as a result.  Uncontroverted evidence shows that every month each of the four owners of the Property—the Byrum Family Trust, ATI Jet, Inc., Mr. Tohme, and Dr. Phelan—would write a check to ATI Resorts, LLC for his or its portion of the payment.  ECF No. 59-6, Ex. 6, Deposition of Connie Parsons, at 20:21–21:1, 25:3–18.  Moreover, the Loans were taken out in Mr. Byrum's name (and Dr. Phelan's), and Mr. Byrum, ATI Jet, Inc., and Mr. Tohme all contributed to the down payment on the property.  ECF No. 63-3, Ex. 3, Note; ECF No. 63-4, Ex. 4, HELOC Note; ECF No. 59-1, Ex. 1, Deposition of Lyle Byrum, at 108:1–19.  Given this evidence, the Court cannot hold as a matter of law that plaintiffs could not have suffered any damages as the result of the Bank's alleged negligent misrepresentation.

As for defendant's second argument, plaintiffs represent that they will designate and disclose a new credit expert before trial.  ECF No. 63 at 18.  The Court accepts this representation at the present time; however, plaintiffs must, of course, present admissible evidence at trial regarding the measure of their damages.

Lastly, the Court notes that to the extent plaintiffs intend to seek damages on the negligent misrepresentation claim based on Mr. Byrum's inability to secure a loan to make repairs to one of ATI Jet, Inc.'s downed jets, such damages do not appear to be a pecuniary loss suffered as a consequence of the plaintiff's reliance upon the Bank's purported negligent misrepresentation.  Plaintiffs' response argues that "[a]fter the [home equity line loan] dropped Mr. Byrum's credit score, he was unable to make repairs to one of ATI Jet's downed jets."  ECF No. 63 at 18.  However, the effect that the home equity line had on Mr. Byrum's credit score is

not in and of itself actionable as a consequence of the alleged negligent misrepresentation. Rather, Ms. Moralez's purported representation that the conventional loan was capable of being refinanced in the near future—when in fact the structure of the Loans made that impossible—serves as the basis of plaintiff's claim. Any damages that do not stem from Mr. Byrum's inability to refinance are thus not properly considered under the negligent misrepresentation claim.

For the reasons set forth above, the Court denies defendant's motion for summary judgment as to the negligent misrepresentation claim.

**3. Negligence**

Defendant also asks the Court to grant summary judgment in its favor on plaintiffs' negligence claim. "In well-settled tort jurisprudence, a claimant alleging negligence of another party must establish the existence of a duty, a breach of that duty, causation, and damages." *Redden v. SCI Colorado Funeral Servs., Inc.*, 38 P.3d 75, 80 (Colo. 2001), *as modified on denial of reh'g* (Jan. 14, 2002). Plaintiffs allege that defendant owed them a duty of care, and that it breached that duty by promising to refinance the Loan but failing to do so, making misleading representations about the status of the Loan, failing to provide a good faith estimate, and acting with "delay and incompetence." ECF No. 58 at ¶¶ 68–69.

However, plaintiffs have failed to offer any legal support for the existence of a duty on which their negligence claim is based. "It is axiomatic that a negligence claim cannot be maintained in the absence of a legal duty. [Where] defendants [do] not establish[] any legal basis for the duty they assert, their negligence claim must fail." *Premier Farm Credit, PCA*, 155 P.3d at 523 (internal citation omitted). *See also Harrison v. Wahatoyas, L.L.C.*, 253 F.3d 552, 560 (10th Cir. 2001) (upholding grant of summary judgment where plaintiff "failed to identify a

specific duty applicable under the facts of this case").  Here, plaintiffs have not identified any duty Wells Fargo owed them that it breached through the actions listed above.  *See* ECF No. 63 at 15–16 (failing to cite any legal authority supporting the existence of such a duty).  Thus, the negligence claim fails as a matter of law, and the Court grants defendant's motion as to this claim.

### 4.  Breach of Fiduciary Duty

Wells Fargo argues that plaintiffs' breach of fiduciary duty claim fails because no such duty existed between itself and plaintiffs.  Under Colorado law, "[i]n the absence of special circumstances, the legal relationship between a lending institution and its customer is that of debtor and creditor."  *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1365 (Colo. App. 1994).  "[T]here is no per se fiduciary duty between a borrower and a lender . . . [However,] a fiduciary relationship between a borrower and a lender has been found to exist where there is a repose of trust by the customer along with an acceptance or invitation of such trust on the part of the lending institution."  *Id.* (internal citation and quotations omitted).  In order to find a fiduciary duty in the lender-borrower context, the parties' interactions must be atypical of those present in a standard lender-borrower relationship.  *See Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 523 (Colo. App. 2006); *Ricotta v. Ocwen Loan Servicing, LLC*, No. CIV.A.06CV01502MSKKL, 2008 WL 516674, at *7 (D. Colo. Feb. 22, 2008).

In the present case, there is insufficient evidence for a jury to find that such an atypical relationship existed between plaintiffs and the defendant.  The plaintiffs point to Mr. Byrum's deposition testimony that he considered Ms. Moralez to be his financial advisor, given the fact that he had banked with Wells Fargo for many years, and that he trusted Ms. Moralez's opinion of the Cordillera Property.  ECF No. 63-1, Ex. 1, Deposition of Lyle Byrum, at 69:24–70:2,

70:23–24.  Ms. Underhill similarly testified that she considered Ms. Moralez to be an investment

adviser because she was "very knowledgeable about the loan process."  ECF No. 63-2, Ex. 2,

Deposition of Deanna Underhill, at 48:14–20.  Furthermore, according to an email sent to a

supervisor, Ms. Moralez gave Dr. Pehlan and his wife her cell phone number and made herself

available to answer their questions after 5:00 pm and on weekends.  ECF No. 63-10, Ex. 10,

12/3/13 Moralez Email, at 1.

      However, these facts do not establish the type of exceptional circumstances necessary for

finding a fiduciary relationship in the borrower-lender context.  Colorado courts have made clear

that the length of a lender-borrower relationship does not itself weigh in favor of the existence of

a fiduciary relationship.  *See Premier Farm Credit, PCA*, 155 P.3d at 523.  Setting aside the

length of the parties- relationship, plaintiffs' contention is essentially that they trusted Ms.

Moralez's opinion, she was knowledgeable about the loan application process, and she was

accommodating—essentially, she was good at her job.  *See Torke v. Fed. Deposit Ins. Corp.*, 761

F. Supp. 754, 757 (D. Colo. 1991) (activities "within the normal course of business" between a

borrower and a lending institution "do not constitute special circumstances to establish a . . .

fiduciary relationship.").  None of the evidence plaintiffs point to suggests that the parties'

relationship involved a repose of trust by Mr. Byrum and his colleagues along with an

acceptance or invitation of such trust on the part of Wells Fargo.

      Moreover, the plaintiffs had already found the Cordillera Property and visited it with a

real estate agent before contacting Ms. Moralez about obtaining financing.  ECF No. 59-2, Ex. 2,

Deposition of DeAnna Underhill, at 19:3–20:24, 23:10–12.  They decided to purchase that

particular property because it was "in a great location," had the type of amenities they wanted,

and overall was the right fit for their purposes.  *Id.* at 22:12–21.  Ms. Underhill contacted Ms.

Moralez after she was recommended by the seller's real estate agent. *Id.* at 12:9–16, 23:10–24:5. Additionally, Mr. Byrum recalls meeting with Ms. Moralez only twice, although they may have also spoken by phone at some point. ECF No. 63-1, Ex. 1, Deposition of Lyle Byrum, at 48:1–8. In sum, even construing all the evidence before the Court in plaintiffs' favor, the relationship between the plaintiffs and Wells Fargo appears to be nothing more than a typical lender-borrower relationship. The Bank therefore did not stand in a fiduciary relationship with plaintiffs, and the Court grants defendant's motion for summary judgment as to the breach of fiduciary duty claim.[8]

### 5. <u>Breach of the Duty of Good Faith and Fair Dealing</u>

Turning to the plaintiffs' next claim, the Court notes that "Colorado, like the majority of jurisdictions, recognizes that every contract contains an implied duty of good faith and fair dealing." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995), *as modified on denial of reh'g* (Jan. 16, 1996). This duty "applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. The covenant may be relied upon *only* when the manner of performance under a specific contract term allows for discretion on the part of either party." *Id.* (internal citations omitted) (emphasis added). Here, plaintiffs have failed to point to any specific contractual provision according discretion to Wells Fargo. *See* ECF No. 58 at 13–14 (alleging only that "[t]he implied contractual duty of good faith

---

[8] Plaintiffs emphasize the following language from *Uioli*: "[N]o fiduciary duty arises between a bank and its borrower where the bank did not offer financial advice, its advice was not always heeded, or where the borrower was advised by others, such as legal counsel." 872 P.2d at 1365 (quoting *Simmons Oil Corp. v. Holly Corp.*, 852 P.2d 523, 526 (Mont. 1993)). Their motion argues that because Ms. Moralez did offer financial advice and Mr. Byrum heeded it, and Mr. Byrum was not advised by legal counsel, *Uioli* "counsels in favor of the existence of a fiduciary duty." ECF No. 63 at 8–9. However, while *Uioli* makes clear that the presence of such conditions necessitates a finding of no fiduciary relationship, it does not necessarily imply that their absence means that such a relationship existed. Rather, the question turns on whether the circumstances surrounding the parties' relationship were so exceptional as to exceed the bounds of a normal borrower-lender relationship. As explained above, the Court finds that they were not.

and fair dealing established the applicable minimum standards to the actions of the parties'

dealings"); ECF No. 63 at 3–5 (failing to mention any contractual term allowing for discretion on

defendant's part in plaintiffs' statement of undisputed facts).  Thus, the Court grants defendant's

motion for summary judgment as to this claim.

### 6. <u>Violations of the Colorado Consumer Protection Act</u>

Wells Fargo also moves for summary judgment on the Colorado Consumer Protection

Act ("CCPA") claim.  To prevail on a CCPA claim, a plaintiff must prove, among other things,

that the defendant engaged in an unfair or deceptive trade practice that "significantly impacts the

public as actual or potential consumers of the defendant's goods, services, or property."  *Park

Rise Homeowners Ass'n, Inc. v. Res. Const. Co.*, 155 P.3d 427, 434-35 (Colo. App. 2006).  Thus,

"[t]he Act is intended to reach practices of the type which affect consumers generally and is not

available as an additional remedy to redress a purely private wrong."  *Rhino Linings USA, Inc. v.

Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 150 (Colo. 2003) (quoting *U.S. Welding, Inc. v.

Burroughs Corp.*, 615 F. Supp. 554, 555 (D. Colo. 1985)).  In determining whether a challenged

practice significantly impacts the public, courts consider "the number of consumers directly

affected by the challenged practice, the relative sophistication and bargaining power of the

consumers affected by the challenged practice, and evidence that the challenged practice

previously has impacted other consumers or has significant potential to do so in the future."

*Martinez v. Lewis*, 969 P.2d 213, 222 (Colo. 1998).

In the present case, plaintiffs' CCPA claim is premised on the Bank's alleged failure to

disclose both that the Cordillera community had been involved in a bankruptcy and litigation and

that the home equity line would reduce Mr. Byrum's credit score such that traditional loan could

not later be refinanced.  ECF No. 58 at ¶¶ 78–79.  Plaintiffs have failed to demonstrate how these

nondisclosures significantly impact the public.  First, only the four owners of the Cordillera

Property were directly affected by any misrepresentation or omission that Ms. Moralez made

during the loan application process.  Second, although Wells Fargo is a large financial

institution, Mr. Byrum and Dr. Phelan appear to be sophisticated businessmen—they manage a

private jet company—and they certainly could have applied for financing at other banks.  *Cf.*

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 150 (Colo. 2003)

(noting that plaintiff's relative sophistication in his education and knowledge of the relevant

business weighed against finding a public impact).  Lastly, plaintiffs have presented no evidence

suggesting that other Wells Fargo customers have been or could be affected by similar

nondisclosures or misrepresentations made by the Bank's representatives.  *See* ECF No. 63 at 15

(failing to point to any such evidence).  *See also Alpine Bank v. Hubbell*, 555 F.3d 1097, 1113

(10th Cir. 2009) (finding no public impact where challenged statements were made to all

potential borrowers but there was no evidence they impacted anyone beyond plaintiffs).  Simply

put, there is nothing in the record before the Court tending to show that any unfair or deceptive

practice had an actual or potential impact on any members of the public beyond the plaintiffs and

Dr. Phelan.  Thus, the actions complained of constituted, at most, a purely private wrong, and the

plaintiffs' CCPA claim fails as a matter of law.  For this reason, the Court grants defendant's

motion as to this claim.

### 7.  Prohibited Acts under C.R.S. 38-40-105

Lastly, defendant moves for summary judgment on plaintiffs' statutory mortgage fraud

claim.  Under C.R.S. § 38-40-105(1)(b), a mortgage lender is prohibited from "mak[ing] a false

promise or misrepresentation or conceal[ing] an essential or material fact to entice . . . a

borrower . . . to enter into a mortgage agreement when, under the terms and circumstances of the

transaction, he or she knew or reasonably should have known of such falsity, misrepresentation, or concealment." Defendant argues that plaintiff's claim under this statue—again grounded in the Bank's alleged failure to disclose information about the pending litigation and the impact the home equity line would have on Mr. Byrum's credit score—fails because (1) the statute does not provide for a private right of action beyond the CCPA and (2) the plaintiffs cannot satisfy various elements of the claim.

The Court is not persuaded by the first argument, which the defendant bases entirely on the provision of the statute defining any violation to be a deceptive trade practice under the CCPA. *See* ECF No. 59 at 16 (citing C.R.S. § 38-40-105(3)). Although defendant is correct that a violation of § 38-40-105 may serve as the basis of a CCPA claim, the statute does not by its terms limit enforcement to claims routed through the CCPA, as defendant contends. *See generally* C.R.S. § 38-40-105. Moreover, this court has previously recognized stand-alone § 38-40-105 claims. *See, e.g.*, *Garrett v. BNC Mortgage, Inc.*, 929 F. Supp. 2d 1120, 1128 (D. Colo. 2013) (finding that plaintiffs had alleged violations of C.R.S. § 38-40-105 in addition to CCPA violations); *Mayhew v. Cherry Creek Mortgage Co.*, No. CIVA09-CV00219-PAB-CBS, 2010 WL 935674, at *16 (D. Colo. Mar. 10, 2010) (treating § 38-40-105 claim and CCPA claim as distinct claims). Thus the Court declines to dismiss the claim on this basis.[9]

Turning to defendant's other arguments, the Court is similarly unpersuaded. First, Wells Fargo contends that the statute "deals only with intentional concealment," without citing any

---

[9] The Court notes, however, that the statute does not appear to explicitly provide for a private right of action. Plaintiffs' contention that C.R.S. § 38-40-105(4) contemplates a private right of action is misplaced; the section merely makes clear that while violations of the statute are deemed to be deceptive trade practices under the CCPA, the statute is not intended to supersede any existing law on what constitutes a deceptive trade practice. In any event, the analysis of whether a private right of action is implied in a given statute turns on considerations not addressed by the parties in their papers. *See, e.g.*, *Taxpayers for Pub. Educ. v. Douglas Cnty. Sch. Dist.*, No. 13SC233, 2015 WL 3948220, at *5 (Colo. June 29, 2015). In light of the case law cited above, the Court will not dismiss the claim at this time.

legal authority to support this proposition.  ECF No. 59 at 15.  However, while other provisions of § 38-40-105 require that a defendant act "knowingly," *see, e.g.*, C.R.S. § 38-40-105(1)(a), (c), (1)(b) does not.  Second, defendant argues that the statute applies only to individual mortgage consultants, not the institutions they represent, again without citation to authority.  ECF No. 59 at 15.  The Court thinks it obvious that institutions fall within the purview of the statute (which applies to the acts of any "mortgage lender," C.R.S. § 38-40-105(1)), and other decisions have assumed as much, *see e.g.*, *Garrett v. BNC Mortgage, Inc.*, 929 F. Supp. 2d at 1128; *Mayhew v. Cherry Creek Mortgage Co.*, No. CIVA09-CV00219PABCBS, 2010 WL 935674, at *16. Lastly, defendant points out that Ms. Moralez "knew nothing about the information she supposedly failed to disclose."  ECF No. 59 at 15.  However, § 38-40-105(1)(b) is not limited to instances in which a lender fails to disclose known information, but rather also provides for liability in scenarios in which a lender "reasonably should have known of [a] falsity, misrepresentation, or concealment."  In sum, the Court is not persuaded by any of defendant's arguments and denies its motion as to this claim.

## III. <u>Conclusion and Order</u>.

For the reasons set forth above, Plaintiff Lyle Byrum's Partial Motion for Summary Judgment [ECF No. 60] is DENIED, and Defendant's Motion for Summary Judgment [ECF No. 59] is GRANTED in part and DENIED in part.  Plaintiffs' claims for negligence, breach of fiduciary duty, breach of the duty of good faith and fair dealing, and violations of the Colorado Consumer Protection Act are dismissed with prejudice.  Plaintiffs may proceed on their claims for fraudulent inducement (although defendant may still file a supplemental motion for summary judgment regarding this claim), negligent misrepresentation based on Ms. Moralez's alleged misrepresentation that the conventional loan could be refinanced, and mortgage fraud under

C.R.S. § 38-40-105.

DATED this 30th day of July, 2015.

BY THE COURT:

R. Brooke Jackson
United States District Judge